UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

In the Matter of the Search of

Grey Sagem My X1-2 Twin labeled as:
    Model: myX1-2a twin
    IMEI: 010585004660575
T-mobile SIM card:
    89012 60200 06069 1682
Phone number: 805-637-7243

08 JUN 20 AM 11:51

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**

CASE NUMBER: '08 MJ 1902

I __Brett Kalina__ being duly sworn, depose and say:

I am a(n) __Special Agent with the Federal Bureau of Investigation__ and have reason to believe
    Official Title

that ___ on the person of or _X_ on the property or premises known as (name, description and or location)

**See attachment A**

in the Southern District of California, there is now concealed a certain person or property, namely (describe the person or property to be seized)

**See attachment B**

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

the fruits, instrumentalities and evidence

concerning violations of 21 U.S.C. Secs. 846 and 841(a)(1).

The facts to support a finding of Probable Cause are as follows:

    See attached affidavit and attachments- continued on the attached sheet and made a part hereof.

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

__6-20-08__ at __San Diego, California__
Date/Time issued

Honorable Nita L. Stormes
United States Magistrate Judge
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## **ATTACHMENT A**

### **PROPERTY TO BE SEARCHED**

The property to be searched is described below:

    Grey Sagem My X1-2 Twin labeled as:
        Model: myX1-2a twin
        IMEI: 010585004660575
    T-mobile SIM card:
    89012 60200 06069 1682
    Phone number: 805-637-7243

The telephone is currently being held by the Federal Bureau of Investigation in San Diego, CA.

## **ATTACHMENT B**

## **ITEMS TO BE SEIZED**

a. Electronic telephone books containing names and telephone numbers;

b. Electronic history of outgoing, incoming and missed calls, including telephone numbers and time, duration, and date of calls;

c. Digital appointment books;

d. Stored messages (both audio and text) to include inbox, outbox, new messages, and saved messages;

e. Stored pictures and animations;

f. Voice memos;

g. Schedules;

h. Notes;

g. Email addresses;

h. Settings of the cellular telephone including but not limited to the telephone number and subscriber history.

# AFFIDAVIT

I, Brett Kalina, being duly sworn, hereby declare and state as follows:

## INTRODUCTION:

1. I have been employed as an FBI Special Agent since June 2004. I am currently assigned to the San Diego Field Division, Organized Crime Squad, and have been since July 2006. Prior to my assignment to the Organized Crime Squad I was assigned to the Major Mexican Drug Task Force Squad for two years. During the investigation of organized Crime I have participated in the investigation of numerous drug related offenses. Additionally received sixteen (16) weeks of formalized training at the FBI Academy in Quantico, Virginia, where I became familiar *inter alia* with how controlled substances are consumed, manufactured, packaged, marketed and distributed. As a Special Agent of the FBI, I have participated in several narcotic investigations of alleged criminal violations of the Controlled Substances Act. I have participated in narcotic investigations and have conducted numerous surveillance operations in connection with narcotic investigations. I am familiar with the operations of illegal drug trafficking organizations in the United States and Mexico, including those organizations whose operations involve the distribution of wholesale quantities of marijuana, cocaine and methamphetamine.

2. Based upon my training and experience, consultation with other law enforcement officers who are also experienced in drug investigations, and all the facts and opinions set forth in this affidavit, I know that:

   a. members of drug organizations often communicate *via* cellular telephones in order to direct and monitor the transportation of drugs. I also know that telephone numbers,

contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of cellular telephones which identify other persons involved in drug smuggling activities.

b.  I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the cellular telephone described herein.

3.  Based on the factual circumstances described in greater detail below, I believe that Michael Krapchan ("KRAPCHAN"), Hassan Shirani ("SHIRANI"), and Ryan Wedding ("WEDDING") were involved in a drug distribution conspiracy and further believe that they each used their respective cellular telephones to further the goals of their conspiracy, including *inter alia* possessing cocaine with the intent to distribute.

4.  This affidavit is submitted in support of the related five applications to search the following five cellular telephones, each described as follows:

|  | Telephone | Referenced herein as: |
|---|---|---|
| a. | Black Motorola "Red" labeled as:<br>    Model: 93733XQBSA<br>    MSN: F29GHUC5KL<br>    IMEI: 359206010233070<br>    Phone number: 604-723-5360 | **Krapchan TT#1** |
| b. | Grey Samsung Telus labeled as:<br>    Model: SCH-U410T<br>    MSN: 0F6E33C2<br>    IMEI: 01507222210<br>    Phone number: 778-886-3507 | **Krapchan TT#2** |
| c. | Grey Motorola phone labeled as:<br>    Model: SZ1RYC34D8<br>    MSN: F29WGZRBP6<br>    IMEI: 354097-Q1-499981-5<br>    Phone number: 604-729-1325 | **Wedding TT#3** |

| | |
|---|---|
| d.  Grey Sagem My X1-2 Twin labeled as:<br>Model: myX1-2a twin<br>IMEI: 010585004660575<br>T-mobile SIM card:<br>89012 60200 06069 1682<br>Phone number: 805-637-7243 | **Shirani TT#4** |
| e.  Brown T-Mobile Blackberry<br>MSN, IMEI information removed from phone( peeled off).<br>SIM card: 89302720400005803965<br>Phone number: Unknown. | **Shirani TT#5** |

for evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846.

**PROBABLE CAUSE:**

5. The information set forth below is based on my personal knowledge and/or information communicated to me from other law enforcement officers involved in the investigation of the aforementioned individuals.

6. Because this affidavit is being submitted for the limited purpose of seeking search warrants for the above listed cellular telephones, I have not set forth each and every fact learned during the course of this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the issuance of the requested search warrant.

7. The FBI has been investigating the money laundering and drug distribution activities of Elmar Akhundov, aka Edward Obolenksi, the leader of the Akhundov drug trafficking organization ("Akhundov DTO"). The Akhundov DTO is based in Vancouver, Canada. As described in greater detail below, KRAPCHAN, SHIRANI, and WEDDING are Akhundov DTO associates.

8. During the months prior to June 13, 2008, an FBI confidential source ("CS-1")[1] met with Akhundov and KRAPCHAN regarding the purchase of cocaine. These negotiations were recorded and occurred over the telephone and in person, in locations that included, but were not limited to, Seattle, Washington and San Diego, California.

9. Pursuant to these negotiations, during recorded conversations over **Krapchan TT#1**, Akhundov and KRAPCHAN agreed to travel to San Diego, California on or about June 9, 2008 to purchase 24 kilograms of cocaine from CS-1. However, on June 10, 2008, agents learned that Akhundov would not be present to complete the previously negotiated transaction. Rather, the DTO unilaterally altered the previously negotiated plan and CS-1 subsequently met only with KRAPCHAN and DTO associates SHIRANI and WEDDING. During this meeting, KRAPCHAN told CS-1 to contact him [KRAPCHAN] over **Krapchan TT#2**.

10. Like KRAPCHAN, SHIRANI and WEDDING traveled to California from Canada. On June 10, 2008, KRAPCHAN introduced SHIRANI and WEDDING as the sources of supply of the money which the DTO intended to use to purchase the previously negotiated amount of cocaine. During recorded conversations between KRAPCHAN, SHIRANI, WEDDING and CS-1, SHIRANI and WEDDING both explained to CS-1 that the buy-money was not instantly available upon their

---

[1] A criminal history check revealed that CS-1 does not have any misdemeanor or felony convictions. Other than being reimbursed for incidental operational expenses, CS-1 has been paid on only one occasion. Approximately nine months ago, CS-1 was paid for his participation in an undercover, out-of-town meeting with the DTO. CS-1 has otherwise not been compensated for his participation in the ongoing investigation. Agents are aware that CS-1 is currently seeking to adjust his/her immigration status. Agents have, however, informed CS-1 that they will not be able to exert any influence on the Department of Homeland Security's consideration of any immigration related matters.

arrival at the Los Angeles International Airport.[2]

    a.    Specifically, WEDDING told CS-1 that they [WEDDING and SHIRANI] understood that the "deal" [drug transaction] would not occur in Los Angeles, but that is where the "paper" [buy money] was located. WEDDING explained that if they had known that the "deal" would occur immediately upon arrival they would have arrived a few days earlier. WEDDING stated that the money was in Los Angeles waiting for "us" [WEDDING and SHIRANI], but that they just had to pick it up. WEDDING then stated, "Obviously, I didn't put it [the buy money] in my [ui] suitcase."

    b.    WEDDING also stated that their [WEDDING's and SHIRANI's] intention was to "grab one" [kilogram of cocaine] and "have a look at it . . . and grab the rest of them later." SHIRANI subsequently stated that "[W]e [WEDDING and SHIRANI] cannot carry money over the border" and stated that they had to get the money in Los Angeles.

    c.    During a conversation, between KRAPCHAN, SHIRANI, WEDDING and CS-1, about the location of the buy money and when and where the drug transaction would occur, SHIRANI placed a telephone call using an unidentified cellular telephone. Based upon the fact that Shirani was in possession of two cellular telephones when he was arrested, agents believe that the cellular telephone was either **Shirani TT#4** or **Shirani TT#5**.

    11.    On June 11, 2008, during a recorded telephone conversation between SHIRANI and CS-1, SHIRANI described how he intended the pending drug transaction to occur. SHIRANI stated that he would give CS-1 money for "two" [kilograms of cocaine]. SHIRANI

---

[2] The following excerpts and quotations are from draft transcriptions that have not been formally reviewed for accuracy. Although these excerpts and quotations are here presented as substantively accurate, some errors and/or omissions may remain.

explained that once the transfer for "two" was completed then they would do another "two." SHIRANI then stated that the first transfer would be for one "car" [kilogram of cocaine] so that he [SHIRANI] can inspect the cocaine and see if it meets his expectations. Ultimately, the parties agreed to conduct the exchange on June 13, 2008.

12. On June 13, 2008, FBI agents observed KRAPCHAN, SHIRANI, and WEDDING arrive together at a San Diego Hampton Inn Hotel while driving in a 2008 Toyota Prius (Cal Lic. # 6DCW983). KRAPCHAN, SHIRANI, and WEDDING entered the hotel together. A short time later, using the aforementioned Toyota, Prius, KRAPCHAN left the San Diego Hampton Inn Hotel and traveled alone to a predetermined location where the previously negotiated drug transaction was to occur. Upon arrival, CS-1 met with KRAPCHAN, whereupon I observed KRAPCHAN exchange seventeen-thousand dollars for one kilogram of cocaine. KRAPCHAN opened the package given to him by CS-1 in what appeared to be an effort to identify what was contained therein. After the exchange took place, CS-1 asked KRAPCHAN to call to inform SHIRANI and WEDDING that the exchange did, in fact, take place as previously negotiated. Using **Krapchan TT# 2**, KRAPCHAN then placed a call to unidentified individuals [believed to be SHIRANI and WEDDING] and stated that he had in fact received the "cocaine" from CS-1. After making this telephone call, KRAPCHAN was placed under arrest. After KRAPCHAN was arrested, investigating agents seized **Krapchan TT#1** and **Krapchan TT#2** from KRAPCHAN.

13. After KRAPCHAN was arrested, SHIRANI and WEDDING were placed under arrest as they were leaving the San Diego Hampton Inn Hotel. At the time of their arrest SHIRANI was in possession of **Shirani TT#4** and **Shirani TT#5**. Wedding was in possession of **Wedding TT#3**.

14. During a subsequent search of the aforementioned Toyota, Prius agents located *inter alia*:

    a. a credit card type hotel key for Comfort Inn with the number "304" written upon it;

    b. a vehicle rental agreement in the name of "Ryan Wedding" with SHIRANI's signature listing SHIRANI as an additional driver; and

    c. a real estate magazine for the San Fernando Valley area.

15. Comfort Inn employees at the Comfort Inn located at 20157 Ventura Boulevard, Woodland Hills, CA 91364, confirmed that room #304 was registered to WEDDING.

16. Pursuant to a search warrant issued in the Central District of California on June 15, 2008, agents from the FBI searched Room #304. Hidden within a piece of the hotel room's furniture, agents located $100,000.00 in United States currency.

17. Based on all of the facts and circumstances described above, I believe that probable cause exists to conclude that KRAPCHAN, SHIRANI, and WEDDING used thier respective cellular telephones to facilitate their conspiracy to possess, with the intent distribute, 24 kilograms of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 846 and 841(a)(1). These target telephones were likely used to store electronic data, which could lead to the the identification of coconspirators, sources of supply for the buy-money, and methods and means used by a transportation cell which would have transported the cocaine to Canada.

18. I also believe that probable cause exists to believe that evidence, fruits, and instrumentalities of KRAPCHAN'S, SHIRANI'S, and WEDDING'S illegal activities continue to exist on the cellular telephones.

19. Therefore, I respectfully request a warrant be issued authorizing the search of the telephones described in Attachment A and seizure of the items listed in Attachment B.

_____
Brett Kalina
Special Agent
Federal Bureau of Investigation

Sworn before me and subscribed in my presence, June ___20___, 2008

_____
Hon. NITA L. STORMES
United States Magistrate Judge